**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 13-21718-CIV-ALTONAGA/Simonton**

**BANK OF AMERICA, N.A.**,

       Plaintiff/Counter-Defendant,

vs.

**GREC HOMES IX, LLC**, *et al*.,

       Defendants/Counter-Plaintiffs.

_____/

## ORDER

    **THIS CAUSE** came before the Court on Plaintiff/Counter-Defendant, Bank of America, N.A.'s (the "Bank['s]") Motion to Dismiss Defendants' Amended Counterclaim . . . ("Motion") [ECF No. 93], filed September 30, 2013.[1]  Defendants/Counter-Plaintiffs, GREC Homes IX, LLC ("GREC IX"); GREC Homes X, LLC ("GREC X"); GREC Homes XI, LLC ("GREC XI"); GREC Homes XII, LLC ("GREC XII"); Augustin Herran ("Herran"); Rosiel Herran ("Herran's Wife"); Armando Guerra ("Guerra"); Maria C. Guerra ("Guerra's Wife"); Manuel Herran ("Herran's Father"); Nyria Herran; Emiliano Herran ("Herran's Cousin"); and Miriam Herran (collectively, "Defendants" or "Counter-Plaintiffs"), filed their Response Opposing Plaintiff's Motion to Dismiss . . . ("First Response") [ECF No. 110] on November 1, 2013.  On November 12, 2013, Defendants filed a Response Opposing Plaintiff's Motion to Strike . . . ("Second Response") [ECF No. 115].  Plaintiff filed its Reply Memorandum in Support of its Motion to Dismiss Defendants' Amended Counterclaim . . . ("First Reply") [ECF No. 120] on November 18, 2013, and its Reply Memorandum in Support of its Motion to Strike Jury Demand ("Second

---

[1]  The Bank's Motion contains three separate "motions": (1) a motion to dismiss the amended counterclaim, (2) a motion to strike affirmative defenses, and (3) a motion to strike jury demand.

Reply") [ECF No. 121] on November 22, 2013. A hearing on the Motion took place on November 26, 2013 [ECF No. 122]. The Court has carefully considered the parties' written submissions and oral arguments, the record, and any applicable law.

## I. BACKGROUND[2]

This matter arises out of a loan transaction for a real estate development project between the Bank and Defendants GREC IX, GREC X, GREC XI, and GREC XII (collectively, the "Borrowers" or "GREC Entities"). (*See* Compl. ¶ 7 [ECF No. 1]). In 1990, when Herran decided to venture into real estate development, the Bank sought his business, and over time Herran "built a relationship of trust and confidence with the Bank that extended far beyond that of a creditor [and] debtor . . . ." (Am. Counterclaim ¶ 9).[3] Herran came to rely on the Bank for financial advice and counted "on the Bank's expertise in the world of finance to support and advise [him] on the Defendants['] business plans . . . ." (*Id.*).

In 2005, Herran and Guerra embarked on a real estate project to develop eighty-two acres of unimproved land into a 1,186 unit residential property initially known as "Keys Edge," but later identified as "Grand Palms." (*Id.* ¶ 11). That same year, GREC IX was formed for the sole purpose of purchasing the unimproved land and developing the Keys Edge property, with Herran serving as the principal and majority owner. (*See id.* ¶ 12). It was estimated that a loan of over $80,000,000 would be required to complete the project. (*See id.* ¶ 14). Various Bank executives and employees, as well as employees from other financial institutions in South Florida,

---

[2] The allegations of Defendants' Counterclaim ("Amended Counterclaim") [ECF No. 68] are taken as true.

[3] The Amended Counterclaim contains a discrete answer to the Complaint, with a set of paragraphs numbered one through forty-six, and a section asserting counterclaims with a second set of paragraphs numbered one through one hundred. All citations to the Amended Counterclaim refer to the numbered paragraphs corresponding to the counterclaims.

approached Herran regarding their financial lending services.  (*See id.*).  During that time, Teresa
Bello ("Bello"), "the Bank executive whose duties included fomenting a relationship of trust
with [] Herran" (*id.* ¶ 10), assured Herran he was an "elite" and "preferred" customer who was
"like family," and the Bank would "always find the way to work things out with respect to any
loan" (*id.* ¶ 13).  As a result of "the relationship of trust and confidence that was established
between [] Herran and the Bank and its executives, including [] Bello, [] Herran chose to give
GREC IX's business to the Bank."  (*Id.* ¶ 14).

In October 2005, Bello and Bank executive John Nichols ("Nichols") suggested Herran
form several shell entities and include them in the Promissory Note [ECF No. 1-2] for the loan in
order to circumvent certain transactional state and local taxes and fees on any future real estate
projects developed under those entities.  (*See id.* ¶ 15).  Bank executives assured Herran this sort
of arrangement was a customary practice of the Bank, and the Bank had provided other "elite"
clients with the same sort of arrangement in the past without incurring any adverse
consequences.  (*Id.*).  In reliance on these representations, Herran formed three other GREC
entities — GREC X, GREC XI, and GREC XII (collectively, the "Phantom GREC Entities") —
and listed them as borrowers on the Promissory Note along with GREC IX.  (*See id.* ¶ 16).  The
Phantom GREC Entities were not involved in any of the land purchases or operations in the
development of Keys Edge.  (*See id.*).

In November 2005, the Bank, through Bello and Nichols, insisted Herran, Guerra,
Herran's Father, and Herran's Cousin (the "Husband Guarantors") — all investors in GREC IX
— each personally guarantee the Promissory Note for the loan.  (*See id.* ¶ 18).  This, despite a
November 2, 2005 appraisal of the Keys Edge land that satisfied the Bank "the loan-to-value
ratio was well within acceptable Bank and regulatory lending limits and lending policy."  (*Id.* ¶

17).   Additionally, the Bank also required the personal guaranties of the wives of the Husband

Guarantors — Herran's Wife, Guerra's Wife, Nyria Herran, and Miriam Herran (collectively, the

"Wife Guarantors").  (*See id.* ¶ 18).  Bello and Nichols insisted obtaining the personal guaranties

of the Husband Guarantors and the Wife Guarantors was standard lending policy and a Bank

requirement.  (*See id.* ¶¶ 18–19).

Based on these representations and Herran's trust in the Bank, the GREC Entities

executed a Promissory Note and Master Loan Agreement [ECF No. 1-1] for $84,250,000 from

the Bank on November 14, 2005, to fund the acquisition of the eighty-two acres of land for Keys

Edge.[4]  (*See id.* ¶ 20).  At the same time, each of the Husband and Wife Guarantors executed

personal Guaranty Agreements [ECF No. 1-2] on the loan.  (*See id.* ¶ 21).  The loan and the

personal guaranties were renewed several times throughout the years, with the most recent

renewal occurring in May 2012.[5]  (*See id.* ¶ 26).

After the loan was executed, Bank executives approached GREC IX executives about

purchasing an interest rate swap[6] to protect the business interest from the possibility of rising

---

[4]  On a motion to dismiss the Court is generally limited to the complaint and attached exhibits.  Counter-Plaintiffs reference the various loan documents in the Amended Counterclaim without attaching them as exhibits.  The Bank attached the loan documents to its Complaint and includes excerpts from the various agreements with its Motion.  Therefore, the Court considers the loan documents because they are referenced in the Amended Counterclaim, are central to the dispute, and their contents are not in dispute.  *See Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284–85 (11th Cir. 2007).

[5]  The Loan Modification Agreement ("Amended Loan Agreement") [ECF No. 1-1] was executed on August 21, 2007; the Second Amendment of Master Loan Agreement ("Second Amended Loan Agreement") [ECF No. 1-1] was executed on January 31, 2008; the Third Amendment of Master Loan Agreement ("Third Amended Loan Agreement") [ECF No. 1-1 ] was executed on February 25, 2009; the Fourth Amendment of Master Loan Agreement ("Fourth Amended Loan Agreement") [ECF No. 1-1] was executed on January 29, 2010; and the Fifth Amended Loan Agreement ("Fifth Amended Loan Agreement") [ECF No. 1-2] was executed on April 29, 2010.  Each Guaranty Agreement was ratified and amended by each of the guarantors four separate times: January 31, 2008 (First Ratification); February 25, 2009 (Second Ratification); January 29, 2010 (Third Ratification); and April 29, 2010 (Fourth Ratification).  (*See* Mot. 3 n.6).

[6]  An interest rate swap agreement is:

interest rates.  (*See id.* ¶ 22).   The Bank, through its executives, represented that interest rates were going to rise.  (*See id.*).  Because the Borrowers' loan was subject to variable interest rates, the Borrowers, according to the Bank executives, could lose thousands, if not millions, of dollars when interest rates increased in the future.  (*See id.*).  The Bank further represented its other elite borrowers were purchasing similar interest rate swaps to protect their interests.  (*See id.*).  At the time these representations were made, the Bank knew them to be false, but used the interest rate swap agreement[7] as a means of garnering more fees from the Borrowers.  (*See id.*).  Relying on these representations, Herran, on behalf of GREC IX, agreed to the Rate Swap.  (*See id.* ¶ 23).  Shortly thereafter, interest rates actually fell, costing the Borrowers thousands of dollars in charges associated with falling interest rates.  (*See id.* ¶ 24).

The Amended Counterclaim contains the following causes of action: fraudulent inducement of GREC IX to enter the Rate Swap (Count I); fraudulent inducement of the Personal Guarantors to execute personal guaranties on the Promissory Note (Count II); breach of fiduciary duty owed to GREC IX related to the Rate Swap (Count III); breach of fiduciary duty owed to the Phantom GREC Entities related to the Promissory Note (Count IV); fraudulent inducement of the Phantom GREC Entities to execute the Promissory Note (Count V); violation

---

a derivative contract between two parties who agree to exchange or 'swap' the interest payments that would arise on hypothetical loans of the 'notational amount' — one party paying at a fixed interest rate and the other at a variable interest rate — with the payments calculated at specific intervals.  The notational amount does not change hands, only the difference between the fixed-rate interest payments and the variable-rate interest payments.  Which party is 'in the money' at the agreed points in time depends on whether the variable rate exceeds the fixed rate or vice versa.

*Power & Tel. Supply Co. v. SunTrust Banks, Inc.*, 447 F.3d 923, 926 n.1 (6th Cir. 2006).

[7]  The interest rate swap agreement entered into by the parties is comprised of the ISDA 2002 Master Agreement [ECF No. 93-1], Schedule to the 2002 Master Agreement [ECF No. 93-2], the March 9, 2006 Confirmation [ECF No. 93-3], and the April 6, 2007 Confirmation [ECF No. 93-4] (collectively, the "Rate Swap").

of the Wife Guarantors' rights under 12 C.F.R. section 202.7(d)(1) (Count VI); and violation of the Bank Holding Company Act, 12 U.S.C. sections 1971–1978 (the "BHCA"), against the Personal Guarantors (Count VII).[8]   (*See generally* Am. Counterclaim).   Additionally, the Amended Counterclaim contains a demand for jury trial and twelve affirmative defenses: (1) Defendants are entitled to a set-off of any alleged damages for payments made; (2) damages must be limited to the terms of the loan documents; (3) the Bank's claims are barred by the doctrine of unclean hands; (4) the Bank contributed to its own alleged damages by refusing to properly fund the loan; (5) any award made to the Bank is subject to offset for damages suffered as a result of the Bank's misconduct; (6) the claims against the Wife Guarantors are barred as violative of the Equal Credit Opportunity Act, 15 U.S.C. sections 1601–1691f (the "ECOA"); (7) the claims against the Personal Guarantors are unenforceable as the guaranties were the result of fraud in the inducement; (8) the claims against the Phantom GREC Entities are barred as the Note and its renewals were procured through fraud; (9) the Promissory Note is void as to the Phantom GREC Entities because it is an illegal attempt to avoid the Florida Documentary Stamp Tax; (10) the Promissory Note is void as to the Phantom GREC Entities as a violation of the Florida Deceptive and Unfair Trade Practices Act (the "FDUTPA"), Florida statutes sections 501.201–501.23; (11) all claims against the Personal Guarantors are unenforceable as the Bank violated the FDUTPA; and (12) all claims against the Personal Guarantors are unenforceable as the Bank violated the BHCA.  (*See generally* Am. Counterclaim).

The Motion seeks dismissal of Counts I through VII, and the striking of Defendants' affirmative defenses and demand for jury trial.  (*See generally* Mot.).

---

[8] Defendants previously stipulated to dismissal of Counts VIII through XI of the Amended Counterclaim. (*See* Stip. of Dismissal of Certain Counts in the Counterclaim Without Prejudice [ECF No. 109]).

## II.  LEGAL STANDARDS

### A.  Motion to Dismiss

"A motion to dismiss a counterclaim pursuant to Federal Rule of Civil Procedure 12(b)(6) is evaluated in the same manner as a motion to dismiss a complaint."  *Great Am. Assur. Co. v. Sanchuk, LLC*, No. 8:10-cv-2568-T-33AEP, 2012 WL 195526, at *2 (M.D. Fla.  Jan. 23, 2012) (citation omitted).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* (quoting *Twombly*, 550 U.S. at 555).

Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (citation omitted).  Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556).  To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).  When reviewing a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations therein as true.  *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).

### B.  Motion to Strike

Pursuant to Federal Rule of Civil Procedure 12(f), "the court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R.

CIV. P. 12(f).  Nevertheless, "a court will not exercise its discretion under the rule to strike a pleading unless the matter sought to be omitted has no possible relationship to the controversy, may confuse the issues, or otherwise prejudice a party."  *Reyher v. Trans World Airlines, Inc.*, 881 F. Supp. 574, 576 (M.D. Fla. 1995) (citing *Poston v. Am. President Lines, Ltd.*, 452 F. Supp. 568, 570 (S.D. Fla. 1978)); *Merrill Lynch Bus. Fin. Servs., Inc. v. Performance Mach. Sys. U.S.A., Inc.*, 04-60861-CIVMARTINEZ, 2005 WL 975773, at *11 (S.D. Fla. Mar. 4, 2005).

### III.  ANALYSIS

The Bank maintains waivers and releases contained in the loan documents "unequivocally releas[ing] every conceivable claim against the Bank by the Borrowers and Guarantors 'relating to the Loan and the Loan Documents'" foreclose Counter-Plaintiffs' claims against the Bank.  (Mot. 18).  According to the Bank, the "broad and unequivocal . . . provisions [in the loan documents] apply to all the causes of action alleged in the Amended Counterclaim." (*Id.* 19).  The Bank argues the effect of the waivers and releases compels dismissal, as the Amended Counterclaim fails to allege facts showing fraudulent inducement.  (*See id.* 20). Similarly, the Bank states Defendants' affirmative defenses are barred "[i]n light of the many releases, waivers, warranties, and disclaimers" contained in the loan documents.  (*Id.* 36).

As to Counts I, II, and V, the Bank alternatively argues that even if Counter-Plaintiffs' claims are not released or waived, these counts should be dismissed because Counter-Plaintiffs have failed to properly state claims for rescission.  (*See id.* 24).  The Bank maintains dismissal of Counts III and IV is warranted because the Bank did not owe GREC IX or the Phantom GREC Entities any fiduciary duties pursuant to the terms of the Rate Swap and loan documents, respectively.  (*See id.* 26).  Regarding Count VI, the Bank contends the Wife Guarantors have failed to state a cause of action for a violation of the ECOA, and in any event, their claim is

barred by the applicable statute of limitations.  (*See id.* 28–29).  Finally, as to Count VII, the Bank asserts Counter-Plaintiffs have failed to state a BHCA claim as a matter of law as banks routinely require personal guaranties as a term and condition of a loan.  (*See id.* 32–33).

According to Counter-Plaintiffs, the waivers and releases in the loan documents are not binding on them, for releases and merger and integration clauses contained in fraudulently induced contracts are unenforceable.  (*See* First Resp. 31).  Additionally, Counter-Plaintiffs assert the loan documents, personal guaranties, and the Rate Swap (and all the provisions within them) are void for violating no less than four statutes.  (*See id.* 38–41).  Further, Counter-Plaintiffs contend they have properly pleaded their fraudulent inducement claims in Counts I, II, and V, and the Amended Counterclaim sufficiently establishes their entitlement to rescission of the various loan documents.  (*See id.* 8–12).  Likewise, Counter-Plaintiffs maintain they have adequately pleaded claims for breach of fiduciary duty in Counts III and IV.  (*See id.* 13).  The Wife Guarantors assert the Amended Counterclaim states a claim for a violation of the ECOA, and the statute of limitations does not bar their claim.  (*See id.* 18–27).  Similarly, Counter-Plaintiffs reason they have adequately pleaded a claim pursuant to the BHCA in Count VII, as the Bank's "expressly condition[ing] the extension of credit to GREC IX on the execution of personal guaranties by all of the Personal Guarantors" constitutes an unlawful tying arrangement. (*Id.* 28).

The Court addresses these several arguments, as well as the challenges to the sufficiency of the affirmative defenses, below.

### A. Enforceability of the Releases, Waivers, and Merger & Integration Clauses

The Bank first asserts all of the counterclaims are improper, as they have been waived and released through the various loan documents.  (*See* Mot. 17–19).  Counter-Plaintiffs insist

the releases and waivers are unenforceable on the basis they were procured through fraud by the Bank and its employees.  (*See* First Resp. 31).

Several contract principles come into play.  "Under Florida law, '[t]he validity and effect of a settlement and release are governed by contract law.'"  *Mergens v. Dreyfoos*, 166 F.3d 1114, 1117 (11th Cir. 1999) (quoting *Travelers Ins. Co. v. Horton*, 366 So. 2d 1024 (Fla. 3d DCA 1979)) (alteration in original).   Nevertheless, "contractual terms may be waived, both expressly and implicitly, by the party to whom the term benefits."  *Husky Rose, Inc. v. Allstate Ins. Co.*, 19 So. 3d 1085, 1088 (Fla. 4th DCA 2009) (alteration, internal quotation marks and citation omitted).  For waiver of a contractual right to exist, as the Bank urges, three elements must be shown: "(1) the existence at the time of the waiver of a right, privilege, advantage, or benefit which may be waived; (2) the actual or constructive knowledge of the right; and (3) the intention to relinquish the right."  *Id.* (citation omitted).  Moreover, "[t]he waiving party must possess all of the material facts for its representations to constitute a waiver."  *Id.* (alteration added, internal quotation marks and citation omitted).

Another applicable contractual principle, upon which Counter-Plaintiffs rely in stating their claims, is the well-settled rule "that a party can not contract against liability for his own fraud[,]" absent specific contractual language to the contrary.  *Oceanic Villas, Inc. v. Godson*, 148 Fla. 454, 458-59 (1941) (citations omitted) ("We recognize the rule to be that fraud in the procurement of a contract is ground for rescission and cancellation of any contract unless for consideration or expediency the parties agree that the contract may not be cancelled or rescinded for such cause, and that by such special provisions of a contract it may be made incontestable on account of fraud, or for any other reason."); *see also Lower Fees, Inc. v. Bankrate, Inc.*, 74 So. 3d 517, 519 (Fla. 4th DCA 2011) (citing *Oceanic Villas* for the legal proposition "that a

fraudulent inducement claim cannot be defeated by a contractual agreement unless the contract specifically states a fraud claim is not sufficient to negate the contract").

Similarly, where, as here, "a party alleges that a contract was procured by fraud or misrepresentations as to a material fact, an integration clause will not make the contract incontestable, and the oral representation may be introduced into evidence to establish fraud." *MeterLogic, Inc. v. Copier Solutions, Inc.*, 126 F. Supp. 2d 1346, 1363 (S.D. Fla. 2000) (citations omitted). To state a claim for fraudulent inducement pursuant to Florida law, Counter-Plaintiffs must allege four elements: "(1) a false statement regarding a material fact; (2) the statement maker's knowledge that the representation is false; (3) intent that the representation induces another's reliance; and (4) consequent injury to the party acting in reliance." *Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294, 1315 (11th Cir. 2007) (citations omitted); *see also Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010) (clarifying that "[j]ustifiable reliance is not a necessary element of fraudulent misrepresentation"). Counter-Plaintiffs have adequately pleaded sufficient facts to support their claims that they were fraudulently induced into signing the various loan documents and personal guaranties, and consequently, the Bank's waiver argument is unavailing.

As stated, Counter-Plaintiffs have alleged the Bank, while acting as a financial advisor to Herran and GREC IX, suggested the creation of the Phantom GREC Entities to avoid paying state taxes in the future, when in reality the Bank was trying to "ensure additional compensation for [itself] by locking [the Phantom GREC Entities] in a vehicle for providing lending and banking services for . . . future real-estate development activities." (Am. Counterclaim ¶ 15). The Bank further represented it had suggested this strategy — a customary practice — to its other elite clients in the past to successfully avoid paying transactional taxes, without suffering any adverse consequences. (*See id.*).

Regarding the personal guaranties, the Bank falsely represented its lending policies prevented it from making loans solely on the creditworthiness of the loan-to-value ratio or the creditworthiness of the loan-to-value ratio and the personal guaranties of the borrowing entities. (*See id.* ¶ 19). Further, the Bank represented the personal guaranties of the spouses of all of the married principal personal guarantors was required (*see id.*), despite the Bank's satisfaction that the loan-to-value ratio was "well within acceptable Bank and regulatory lending limits and policy" (*id.* ¶ 17). The Bank misrepresented to Herran and GREC IX's vice president, Daniel Herran, that interest rates were going to rise, "subject[ing] [the Borrowers] to hundreds of thousands, if not millions, of dollars in variable interest rate charges going forward" (*id.* ¶ 22), resulting in GREC IX's purchase of the Rate Swap (*see id.* ¶ 23). The foregoing are alleged to be false statements, thereby satisfying the first element.

As to the second and third elements, the Bank and its executives knew or should have known all of these statements were false when they were made, and intended to induce Counter-Plaintiffs' reliance. (*See id.* ¶¶ 22, 31, 38, 61). Counter-Plaintiffs relied on the Bank's false representations when signing the various loan documents and guaranties (*see id.* ¶¶ 16, 20, 21, 33, 40, 63), and Counter-Plaintiffs continued to rely on these representations — without knowledge of their fraudulent nature — each time they renewed and extended the loan and guaranties (*see id.* ¶ 28). Last, the Borrowers, Husband Guarantors, and Wife Guarantors suffered damages as a result of these fraudulent misrepresentations. (*See id.* ¶¶ 25, 34, 41, 64). All four elements of fraudulent inducement are pleaded in the Amended Counterclaim with supporting facts.

The Bank nevertheless argues "[t]here are no allegations in the Amended Counterclaim tending to show that the Bank fraudulently induced the Defendants to include the releases,

waivers, and other provisions in the various documents." (Mot. 20). The Bank cites *Mergens* in an effort to advance its position that any alleged fraud "must go to the specific provisions [of the releases and waivers] in question." (*Id.* (citation omitted)). The Bank's interpretation of *Mergens* fails to persuade. In *Mergens*, parties disagreed over the enforceability of a general release of claims contained in a stock purchase agreement. *See Mergens*, 166 F.3d at 1117. The plaintiffs alleged they had relied on a fraudulent misrepresentation made by the defendants, thereby inducing plaintiffs to sell their interest in a company at a rate well below market value. *See id.* at 1116. But in light of the adversarial relationship between the parties, the Eleventh Circuit concluded plaintiffs' "reliance on such misrepresentation was unjustifiable as a matter of law." *Id.* at 1119. *Mergens* did not hold, as the Bank contends, that to invalidate a contractual release or waiver on the basis of fraudulent inducement, the alleged fraud must go to the specific provisions of the releases and waivers in question; the court concluded no fraud had occurred given the relationship of the parties. *See id.*

Here, no such adversarial relationship (pre-dating the lawsuit) is present. To the contrary, the Amended Counterclaim asserts "a relationship of trust and confidence" was established between Herran and the Bank. (Am. Counterclaim ¶ 9). Further, the court in *Mergens* analyzed the plaintiffs' reliance on defendants' representations in entering the stock purchase agreement holistically, not just in relation to the release. *See Mergens*, 166 F.3d at 1117–1119. The Amended Counterclaim clearly alleges the Bank's various misrepresentations induced Counter-Plaintiffs into agreeing to the loan, guaranties, and Rate Swap.[9]

---

[9] The Bank makes a ratification argument that is similarly unavailing. In the First Reply, the Bank contends the Defendants repeatedly ratified, released, and waived all claims against the Bank "when [Defendants] executed the Second, Third, Fourth, and Fifth Amended Loan Agreements, and the Second, Third, and Fourth Ratification of the Guaranty Agreement . . . ." (First Reply 10). But the Amended Counterclaim alleges the Bank continually made misrepresentations regarding its lending policies "[a]t the time of each of the renewals or extensions[.]" (Am. Counterclaim ¶ 27). Defendants also allege they

The Bank also cites *Hillcrest Pacific Corp. v. Yamamura*, 727 So. 2d 1053 (Fla. 4th DCA 1999), to advance its related argument that the merger and integration clauses contained in the loan documents, along with the broad releases, warranties, and disclaimers in the loan documents, "explicitly disclaim any 'inducements' to enter into them." (Mot. 21). The court in *Hillcrest* held that "[a] party cannot recover in fraud for alleged oral misrepresentations that are adequately covered or expressly contradicted in a later written contract." *Hillcrest*, 727 So. 2d at 1056 (citations omitted). The *Hillcrest* court was dealing with a situation where a purchase agreement "plainly contradict[ed] the allegations of the complaint and [was] fatally inconsistent with [the plaintiff]'s claim of fraud in the inducement." *Id.* Here, no such inconsistencies or express contradictions are present. Indeed, the loan documents do not explicitly release the Bank from liability for claims of fraud. Moreover, the fraudulent misrepresentations alleged by Counter-Plaintiffs are not "adequately covered or expressly contradicted" by the language of any of the loan documents. As Counter-Plaintiffs have properly pleaded the elements of fraudulent inducement, the releases and disclaimers contained in the loan documents do not compel a dismissal of the counterclaims or the striking of affirmative defenses.

### B.  Counts I, II, & V — Fraudulent Inducement Claims

The Bank next asserts Counter-Plaintiffs' claims for fraudulent inducement fail because Counter-Plaintiffs are unable to state a claim for the relief Counts I, II, and V seek — namely, rescission of the loan documents and Rate Swap. (*See* Mot. 24–26). The Bank makes several

---

relied on the Bank's prior representations regarding the Bank's lending policies and on the parties' relationship of trust "in connection with all renewals and extensions of the loan and guaranties . . . , lacking knowledge of the fraudulent nature of [those representations]." (*Id.* ¶ 28). Defendants have alleged an ongoing fraud in the procurement of each renewal and extension. *Cf. Merovich v. Huzenman*, 911 So. 2d 125, 127 (Fla. 3d DCA 2005) ("Execution of a contract *with knowledge that an initial agreement was fraudulently procured* constitutes a waiver of claims based on the previous fraud." (emphasis added)).

arguments about the deficiencies in the rescission remedy sought in the Amended Counterclaim: rescission is unavailable because the Bank was not notified by Counter-Plaintiffs of their intent to rescind the various agreements, the benefits received by Counter-Plaintiffs have not been returned to the Bank, and Counter-Plaintiffs have failed to allege an inadequate remedy at law. (*See* First Reply 3–9).  Counter-Plaintiffs maintain they have properly rescinded the fraudulently induced contracts, and moreover they received no benefit from the guaranties and loan documents that can be returned.  (*See* First Resp. 9–10).

A contract entered as a result of fraudulent inducement results in a voidable contract.  *See Mazzoni Farms, Inc. v. E.I. DuPont De Nemours and Co.*, 761 So. 2d 306, 313 (Fla. 2000) (citation omitted).  "Florida law provides for an election of remedies in fraudulent inducement cases: rescission, whereby the party repudiates the transaction, or damages, whereby the party ratifies the contract." *Id.* (citation omitted).  Although rescission is a "drastic and extraordinary measure . . . [rescission] is appropriate in situations where one party has fraudulently induced another party to contract . . . ."  *Ohio Players, Inc. v. Polygram Records, Inc.*, No. 99Civ.0033, 2000 WL 1616999, at *3 (S.D.N.Y. Oct. 27, 2000) (citation and internal quotation marks omitted).  "[A] party seeking rescission must show, *inter alia*, that he has rescinded the contract and notified the other party of such rescission, has offered to return any benefits from the contract[,] and has no adequate remedy at law."  *Gov't of Aruba v. Sanchez*, 216 F. Supp. 2d 1320, 1365 (S.D. Fla. 2002) (citing *Billian v. Mobil Corp.*, 710 So. 2d 984, 990–91 (Fla. 4th DCA 1998)).   Where no tangible benefit is provided, alleging the return of benefits is unnecessary.  *See Crown Ice Mach. Leasing Co. v. Sam Senter Farms, Inc.*, 174 So. 2d 614, 618 (Fla. 2d DCA 1965); *see also Staaldam Beheer B.V. v. ASAP Installations, LLC*, No. 809-CV-02226-T-17EAJ, 2010 WL 1730780, at **4-5 (M.D. Fla. Apr. 28, 2010).

Generally, a party seeking rescission of a contract on the basis of fraud must promptly notify the other party upon the discovery of the fraud.  *See Sanchez*, 216 F. Supp. 2d at 1365 (citations omitted); *Street v. Bartow Growers Processing Corp.*, 67 So. 2d 228, 232 (Fla. 1953) (citations omitted).  The Amended Counterclaim does not specifically allege when Counter-Plaintiffs discovered the allegedly fraudulent nature of the Bank and its employees' conduct. Yet Counter-Plaintiffs allege "at all relevant times" they "rel[ied] on the reposed relationship of trust and the Bank's prior representations . . . [without] knowledge of [their] fraudulent nature . . . ."  (Am. Counterclaim ¶ 28).  Counter-Plaintiffs take the position "the allegations contained in the [Amended] Counterclaim make clear that the fraudulent misrepresentations at the heart of the fraudulent inducement of the [Rate] Swap were not discovered by GREC IX until this action was initiated by the Bank[,] thus rendering the inducement representations false as a matter of fact." (First Resp. 12 n.7; *see also* Am. Counterclaim ¶ 60 ("Defendants never received notice or knowledge [sic] to the false nature of these representations until after the initiation of their litigation.")).  At the very latest the Bank had actual notice of the Counter-Plaintiffs' intent to seek rescission when the Amended Counterclaim was filed on September 3, 2013 — less than four months after the Bank filed the Complaint.  The Court cannot say Counter-Plaintiffs did not provide the Bank with timely notice of their intent to rescind as a matter of law.  *See United Air Lines, Inc. v. ALG, Inc.*, 912 F. Supp. 353, 360 (N.D. Ill. 1995) (denying summary judgment on argument that rescission claim was untimely where it was unclear when the counter-plaintiff discovered facts which would have alerted it of a possible claim for rescission and, at the latest, the claim was brought within six months of the counter-plaintiff's discovery of facts which would have alerted it of a possible claim for rescission).

The remaining arguments concerning the absence of allegations of a return of benefits or the inadequacy of a remedy at law are addressed in relation to Counts I, II, and V separately.

### 1. Count I

Regarding the Rate Swap, GREC IX contends there is no benefit to return because the interest rates actually fell — rendering GREC IX's purchased right to a fixed interest rate useless. (*See* First Resp. 12; Am. Counterclaim ¶ 24). The Court disagrees. The Rate Swap functioned to protect GREC IX from less predictable, variable interest rates by providing GREC IX with a fixed interest rate. GREC IX received the benefit of protection from the possibility of rising interest rates throughout the term of the loan. *Cf. Caper Corp. v. Wells Fargo Bank, N.A.*, No. 7:12-CV-357-D, 2013 WL 4504450, at *12 (E.D.N.C. Aug. 22, 2013) ("Here, the interest rate swap was not useless. Rather, the swap functioned as intended by protecting [the plaintiff] from potentially high variable interest rates and providing [the plaintiff] fixed interest payments rather than unpredictable, variable interest payments."). Nor can GREC IX restore the Bank to the *status quo ante*, as the Bank essentially provided GREC IX an insurance policy against the threat of rising inflation rates. As GREC IX is incapable of returning the benefits it received from the Rate Swap, the equitable remedy of rescission is unavailable to GREC IX, and Count I is dismissed. *See Mazzoni Farms*, 761 So. 2d at 313 ("A prerequisite to rescission is placing the other party in status quo. . . . Generally, a contract will not be rescinded even for fraud when it is not possible for the opposing party to be put back into his pre-agreement status." (citations and internal quotation marks omitted)).

### 2. Count II

The Husband and Wife Guarantors allege they were fraudulently induced into signing unwarranted personal guaranties for the loan when, in fact, the loan could have been made based

on the loan-to-value ratio.  (*See* Am. Counterclaim ¶¶ 35–41).  Although the Husband and Wife Guarantors have successfully pleaded the basic elements of a claim for fraudulent inducement, *see* Part III.A *supra*, they have failed to adequately plead the remedy of rescission of the guaranties.  Nowhere in the Amended Counterclaim do the Husband and Wife Guarantors allege they returned the benefits they received.  Although the Husband and Wife Guarantors may state a claim for rescission without specifically alleging the return of any benefit received so long as they allege they received no benefits, the allegations do not support such a claim.  The Amended Counterclaim does not even state the Husband and Wife Guarantors did not receive a benefit.[10] Without adequately pleading their rescission claim, the Husband and Wife Guarantors may not avoid the consequences of the releases and disclaimers in the loan documents.  *See Mazzoni Farms*, 761 So. 2d at 313 ("[T]he necessary precondition for rescission is tender of the benefits received under the contract.").  The Court agrees with the Bank that Count II fails to state a cause of action for which relief may be granted.

> 3. *Count V*

Like GREC IX, the Phantom GREC Entities claim they were fraudulently induced to sign the Promissory Note and seek rescission of that agreement.  (*See* Am. Counterclaim ¶¶ 58–64). They allege any and all money funded by the Bank was specifically loaned to GREC IX for the acquisition and development of Keys Edge (*see id.* ¶ 12), and the Phantom GREC Entities "would not be purchasing the subject land nor engaging in any operations whatsoever associated

---

[10] Nor does the Court perceive how an amendment to the counterclaim could cure this defect as to the Husband Guarantors who, unlike the Wife Guarantors, were all investors in or principals of GREC IX. *See FDIC v. Kuang Hsung Chuang*, 690 F. Supp. 192, 196–197 (S.D.N.Y. 1988) (finding rescission of a personal guaranty was inappropriate where the defendant who sought rescission of the guaranty was the president of the company receiving the loan and had thus "received the benefit of the bargain").

with the development of Keys Edge" (*id.* ¶ 16).[11]   According to the Phantom GREC Entities,
although they were included as "borrowers" on the note associated with the loan, the Phantom
GREC Entities were "shell entities" placed on the Promissory Note for the express purpose of
avoiding certain transactional taxes on "any future real estate projects Defendants chose to
develop," by treating "any future loan acquisition as an extension of the existing loan rather than
as a brand new loan for purposes of acquiring an unrelated parcel of land." (*Id.* ¶ 15).  Arguably,
Counter-Plaintiffs have pleaded enough facts to support their assertion that the Phantom GREC
Entities never received a benefit pursuant to the loan.

Nevertheless, Counter-Plaintiffs have failed to plead the Phantom GREC Entities are
without an adequate remedy at law.  Although Counter-Plaintiffs' papers boldly state, "the
allegations of the [Amended] Counterclaim make clear that no adequate remedy at law exists"
(First Resp. 10), Counter-Plaintiffs fail to cite a single paragraph in the Amended Counterclaim
that supports such a "clear" conclusion.  *See, e.g., Democratic Republic of the Congo v. Air
Capital Group, LLC*, No. 12-20607-CIV, 2013 WL 3223688, at *8 (S.D. Fla. June 24, 2013)
("Although ratifying a contract waives a party's right to rescind it, . . . the Court can find nothing
in Florida law that suggests that by seeking damages — a permitted remedy for fraudulent
inducement — a party waives its fraud claim." (citations omitted))).  Counter-Plaintiffs cite to
*Ganaway v. Henderson*, 103 So. 2d 693, 695–96 (Fla. 1st DCA 1958), for the proposition that a
court may unravel a contract even without a showing of an inadequate remedy at law.  (*See* First
Resp. 10–11).  In *Ganaway*, the court held the defendant's filing of a motion to dismiss for

---

[11]   Counter-Plaintiffs additionally argue, "with respect to the Phantom GREC Entities, the [Promissory]
Note is "void and unenforceable as an illegal attempt . . . to avoid the Florida Documentary Stamp Tax [,
Florida Statutes sections 201.01–201.24]."  (First Resp. 39 (citation omitted)).  Counter-Plaintiffs do not
plead that any loan document is illegal, or that a violation of a statute actually took place.  (*See generally*
Am. Counterclaim).  Moreover, the facts alleged do not show how the Bank violated a statute by entering
into an agreement with Defendants in an attempt to reduce Defendants' tax liability.

failure to state a cause of action did not preserve his right to attack the jurisdiction of the court of equity on the basis of an inadequate remedy at law — not that an inadequate remedy of law need not be pleaded for rescission. *See Ganaway*, 103 So. 2d at 696–97. Moreover, the plaintiff had "prayed for certain equitable relief grounded upon fraud, turpitude of consideration, and cancellation by mutual consent" through her complaint. *Id.* at 695. Here, no such mutual consent to cancel any of the agreements entered into by the parties has been alleged. The Phantom GREC Entities have not adequately pleaded a ground for rescission, and Count V is dismissed.

### C. Counts III and IV — Breach of Fiduciary Duty

The Bank next argues the two claims of breach of fiduciary duty fail as a matter of law because the Bank, as a creditor dealing at arm's length, did not owe the Borrowers the duties of a fiduciary. (*See* Mot. 26–29). Specifically with regard to GREC IX, the Bank maintains the Rate Swap expressly states the Bank is not acting as GREC IX's fiduciary. (*See id.* 26). Counter-Plaintiffs assert the facts alleged show Counter-Plaintiffs and the Bank had established a relationship of confidence and trust sufficient to create a fiduciary relationship between the parties. (*See* First Resp. 15–17).

To state a claim for breach of fiduciary duty under Florida law, Counter-Plaintiffs must show: (1) the existence of a fiduciary duty; (2) a breach of that duty; and (3) damages incurred as a result of the breach. *See Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002). "A fiduciary relationship may be implied by law, and such relationships are premised on the specific factual situation surrounding the transaction and the relationship of the parties." *Doe v. Evans*, 814 So. 2d 370, 374 (Fla. 2002) (internal quotation marks and citation omitted). With regard to financial institutions, "[a] bank and its customers generally deal at arm's-length as creditor and debtor, and

a fiduciary relationship is not presumed." *Bldg. Educ. Corp. v. Ocean Bank*, 982 So. 2d 37, 40–41 (Fla. 3d DCA 2008) (citation omitted). "A fiduciary relationship [between a bank and debtor] may arise, however, under special circumstances where the bank knows or has reason to know that the customer is placing trust and confidence in the bank and is relying on the bank so to counsel and inform him." *Id.* at 41 (internal quotation marks and citation omitted). These special circumstances may exist where a financial institution "takes on extra services for a customer, receives any greater economic benefit than from a typical transaction, or exercises extensive control." *Id.* (internal quotation marks and citations omitted).

The two claims of breach of fiduciary duty are addressed separately.

### 1. *Count III*

The Bank reasons GREC IX cannot be owed a fiduciary duty because the express terms of the Rate Swap disclaim the existence of a fiduciary relationship under that agreement. (*See* Mot. 26). GREC IX "disputes that the [Rate] Swap contains language that operates, as a matter of law, to negate the fiduciary relationship that existed between itself and the Bank . . . when . . . the Bank made false misrepresentations to GREC IX in order to induce it into entering into the [Rate] Swap." (First Resp. 16 (citation omitted)). Further, even if the terms of the Rate Swap could operate to negate the fiduciary relationship between the parties, GREC IX maintains it may still rescind the Rate Swap based on its fraudulent inducement claim in Count I, thereby rendering any disclaimers in the Rate Swap inconsequential. (*See id.* 17).

As a matter of law, no fiduciary relationship will generally be found to exist where a contract clearly and unambiguously disclaims the possibility of a fiduciary relationship. *See SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, No. 06-80652-CIV, 2007 WL 7124464, at *7 (S.D. Fla. Feb. 12, 2007) (finding the defendant was not a fiduciary to the plaintiff where the

prime brokerage agreement entered into by both parties expressly stated the defendant "was not acting as a fiduciary"); *Asian Vegetable Research and Dev. Ctr. v. Inst. of Int'l Educ.*, 944 F. Supp. 1169, 1178 (S.D.N.Y. 1996); *cf. Murphy-Hoffman Co. v. Bank of America, N.A.*, No. 09-00227-CV-W-FJG, 2009 WL 2524773, at *6 (W.D. Mo. Aug. 14, 2009) (finding a merger clause and non-reliance provision contained in an interest rate swap agreement between the parties was not dispositive in determining whether the parties, a borrower and a lender, were engaged in a fiduciary relationship regarding a separate agreement for "financial advice and products" because "it [was] reasonable to infer that the provisions applied only to the communications specifically related to a certain transaction[— namely, the interest rate swap agreement]").

By the terms of the Rate Swap, GREC IX and the Bank represented to one another that "[t]he other party is not acting as a fiduciary for or an advisor to it in respect of that Transaction." (Schedule to the 2002 Master Agreement Part 4(m)). The disclaimer contained in the Rate Swap expressly and unambiguously denies the existence of a fiduciary relationship between the Bank and GREC IX for the purposes of that transaction. Consequently, unless GREC IX is able to state a claim for rescission of the Rate Swap on the basis of fraudulent inducement, a fiduciary relationship cannot exist between the Bank and GREC IX as to the Rate Swap.[12] As the Court has already determined GREC IX has failed to state a claim for rescission of the Rate Swap, Count III fails to state a cause of action. *See* Part III.B.1, *supra*.

### 2. Count IV

Regarding the Phantom GREC Entities, the Bank contends the conclusory statements in the Amended Counterclaim fail to allege the special circumstances necessary to state a cause of

---

[12] Counter-Plaintiffs concede as much in the First Response, where they acknowledge GREC IX can render the disclaimers in the Rate Swap unenforceable "'only by suing to rescind the instruments that contain them . . . .'" (First Resp. 17 (citations omitted)).

action for breach of fiduciary duty against a simple creditor such as the Bank.  (*See* Mot. 26–27).
The Phantom GREC Entities insist they "assert allegations sufficient to satisfy the pleading
requirements for their breach of fiduciary duty claims against the Bank." (First Resp. 15).

The Court agrees the Phantom GREC Entities have alleged sufficient facts to plead a
claim for breach of fiduciary duty against the Bank.  First, the Phantom GREC Entities allege
they had a relationship of trust and confidence with the Bank.  The Bank and its executives
represented to Herran "that the Bank would always find the way to work things out with respect
to any loan [the Bank] make[s]," "not to worry about anything," and Herran was "like family."
(Am. Counterclaim ¶ 13 (internal quotation marks omitted)).  Not only did the Bank know there
was a confidence between the parties, but Counter-Plaintiffs assert Bello's "duties included
fomenting a relationship of trust with [] Herran in order to induce him to bring . . . Defendants'
business to the Bank."  (*Id.* ¶ 10).  This confidence was allegedly breached when the Bank
induced the Phantom GREC Entities into executing the Promissory Note, thereby placing the
Bank's interests before the interests of the Phantom GREC Entities and resulting in damages to
the Phantom GREC Entities.  (*See id.* ¶¶ 56–57).

Counter-Plaintiffs also allege special circumstances transformed a lender/borrower
relationship into a fiduciary one.  The Amended Counterclaim states the Bank offered Counter-
Plaintiffs additional services, including advice regarding how to structure the loans and advice
regarding interest rate protection.  (*See id.* ¶¶ 15, 52).  The Phantom GREC Entities were formed
at the "unusual suggestion" of the Bank and its executives, and were included on the Promissory
Note "to avoid paying transaction taxes to the State of Florida" and "to ensure additional
compensation for the Bank by locking [the Phantom GREC Entities] in a vehicle for providing
lending and banking services for any of Defendants['] future real-estate development activities."

(*Id.* ¶ 15).  The Bank received a greater economic advantage than it would from a typical loan transaction by locking the Phantom GREC Entities into an agreement that was designed to capture Counter-Plaintiffs' future real-estate development business.  Count IV is not dismissed.

### D.  Count VI — Violation of 12 C.F.R. section 202.7(d)(1)

The Bank maintains 12 C.F.R. section 202.7(d)(1) is simply an administrative regulation that does not furnish a private cause of action to Counter-Plaintiffs, who should have properly brought their claim in Count VI pursuant to the ECOA.  (*See* Mot. 29).  Also, the Bank contends Count VI fails as it is brought outside a two-year statute of limitations period.  (*See id.* 30–31).  Counter-Plaintiffs state the releases do not prevent Counter-Plaintiffs from asserting ECOA claims because the releases were obtained by fraud.  (*See* First Resp. 30–31).  Further, Counter-Plaintiffs maintain the Bank's March 25, 2012 loan extension "re-started" the statute of limitations, and as a result, their claims are not time-barred.  (*Id.* 26).

The allegations of the Amended Counterclaim put the Bank on notice that Count VI is brought pursuant to the ECOA and not merely its implementing regulation.  The Bank, in its Motion, recognizes "[t]he Wife Guarantors' claim, if any, arises under section 1691(a)(1), not the administrative regulation."  (Mot. 29).  Counter-Plaintiffs' reference to the administrative regulation and failure to cite to the ECOA do not serve an as a sufficient basis for dismissal of Count VI, where the parties clearly understand the claim to arise under the ECOA.

Pursuant to the ECOA, it is "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . on the basis of . . . sex or marital status . . . ."  15 U.S.C. § 1691(a).  "Specifically, the ECOA prohibits a creditor from requiring a spouse's signature on a note when the applicant individually qualifies for credit."  *Stern v. Espirito Santo Bank of Fla.*, 791 F. Supp. 865, 867 (S.D. Fla. 1992) (citations omitted).  The

ECOA's regulations define an applicant as "any person who requests or who has received an extension of credit from a creditor, and includes any person who is or may become contractually liable regarding an extension of credit.  For purposes of § 202.7(d), the term includes guarantors, sureties, endorsers and similar parties."  12 C.F.R. § 202.2(e). "The purpose of the ECOA is to eradicate credit discrimination waged against women, especially married women whom creditors traditionally refused to consider for individual credit."  *Anderson v. United Fin. Co.*, 666 F.2d 1274, 1277 (9th Cir. 1982) (citation omitted).

The Bank argues the Amended Counterclaim fails to state a cause of action under 15 U.S.C. section 1691(a)(1) because it does not allege "the Bank refused to extend credit to the Wife Guarantors, or extended it 'on less favorable terms.'"  (Mot. 30).  However, a cause of action for a violation of the ECOA may rely on allegations that a creditor has improperly required the spouse of a creditworthy loan applicant to serve as an additional party to the loan in contravention of 12 C.F.R. section 202.7(d)(5).  *See Stern*, 791 F. Supp. at 867; *Vietinghoff v. Miami Beach Fed. Credit Union*, 657 So. 2d 1208, 1209 (Fla. 3d DCA 1995) ("Congress has authorized the promulgation of federal regulations in order to enforce and administer the ECOA. . . .  A violation of these federal regulations constitutes a substantive violation of the ECOA." (internal citations omitted)); *see also In re DiPietro*, 135 B.R. 773, 777 (Bankr. E.D. Pa. 1992) (concluding proof that a lender required a wife's signature on a promissory note as the spouse of the primary borrower constituted *prima facie* evidence of a violation of the ECOA).

Counter-Plaintiffs allege the Bank required the Wife Guarantors to personally guarantee the full amount of the loan as a condition to making the loan, in violation of the ECOA. Counter-Plaintiffs additionally claim an appraisal of the Keys Edge land showed the loan-to-value ratio was within established banking policies and guidelines, and GREC IX was

independently creditworthy.   Assuming the Wife Guarantors were required to personally guarantee the loans despite the independent creditworthiness of GREC IX, Counter-Plaintiffs have adequately pleaded a cause of action for violation of the ECOA.

The Bank also insists a two-year statute of limitations bars the Counter-Plaintiffs' ECOA claims.[13]  The Bank argues the statute of limitations began to run on April 29, 2010, the date of the last ratification of the original Promissory Note.  (*See* First Reply 21).  Citing *Stern*, Counter-Plaintiffs assert the statute of limitations did not begin to run until March 25, 2012, the date the parties agreed to the Second Loan Extension.[14]  (*See* First Resp. 23).

In *Stern*, the court held the two-year statute of limitations began to run when the bank required the plaintiff to guarantee her husband's business loan.  *See Stern*, 791 F. Supp. at 868. But the court also found "the ECOA imposes an affirmative obligation upon a creditor to reevaluate the need for an additional party when a credit obligation is renewed, and to do so without discrimination on the basis of marital status . . . ."  *Id.* at 869.  Here, the terms of the Second Loan Extension expressly state the Bank would only extend the maturity date upon certain terms and conditions, including the satisfaction of "[a]ll applicable regulatory requirements, including appraisal requirements," and that "Borrower shall have paid all costs and fees of a new or updated appraisal . . . which appraisal shall reflect a Loan-to-Appraised Value of equal to or less than ninety-five percent (95%)."  (Third Amended and Restated Promissory Note

---

[13]   Although the current statute of limitations period for a violation of the ECOA is five years, the previous limitations period of two years applies to all claims accruing prior to July 21, 2010.  *See Haug v. PNC Fin. Servs. Group, Inc.*, 930 F. Supp. 2d 871, 879 (N.D. Ohio 2013) ("[A]ny ECOA claim accruing before July 21, 2010, is subject to a two-year limitations period, not the subsequently enacted five-year period.").

[14]   Counter-Plaintiffs take no position as to which limitations period applies — the two-year or the five-year statute of limitations.  If the Counter-Plaintiffs' interpretation of *Stern* is correct, the ECOA claim would be timely under either limitations period.  The Court's analysis assumes the two-year statute of limitations applies.

§§ 7(a)(vi), (viii) [ECF No. 1-2]).  Thus, it appears the Borrowers' creditworthiness should have been reevaluated as a term and condition to the Second Loan Extension.  Pursuant to *Stern*, such a reevaluation of creditworthiness may create an independent basis for an ECOA claim, thereby resetting the statute of limitations period.  *See Stern*, 791 F. Supp. at 869.

On a motion to dismiss it is not clear Counter-Plaintiffs' ECOA claim is untimely.  *See, e.g., Omar ex rel. Cannon v. Lindsey*, 334 F.3d 1246, 1252 (11th Cir. 2003) (concluding "statute of limitation issue" could not be resolved, as it would depend on "facts not yet in evidence" or by "construing factual ambiguities in the complaint" in defendants' favor.").

### E.  Count VII — the BHCA Violation

Regarding Counter-Plaintiffs' claim that the Bank violated the BHCA by illegally tying the loan agreement to the condition the Husband and Wife Guarantors personally guarantee the loan, the Bank argues it is a traditional banking practice for banks to require guaranties on loans, and thus no violation occurred.  (*See* Mot. 32–33).  Counter-Plaintiffs insist requiring the personal guaranties of investors and their wives where the loan-to-value ratio far exceeds the value of the loan is not a usual bank practice and results in a violation of the BHCA.  (*See* First Resp. 28–29).

Pursuant to 12 U.S.C. section 1972, "[a] bank shall not in any manner extend credit, lease or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement — (C) that the customer provide some additional credit, property, or service to such bank, other than those related to and usually provided . . . ." *Id.* § 1972(1)(C).  To establish a claim under section 1972(1), Counter-Plaintiffs must show "the condition placed on the loan is 1) an unusual banking practice; 2) an anticompetitive tying arrangement; and 3) a practice that benefits the bank." *Cohen v. United Am. Bank of Cent. Fla.*,

83 F.3d 1347, 1350 (11th Cir. 1996) (citations omitted).   It is not enough for the tying arrangement to be unusual or unconventional; to constitute a violation of the BHCA, the arrangement must be anti-competitive.  *See Marchelle Corp. v. Nat'l State Bank*, Civ. A. No. 92-5111, 1993 WL 39661, at *4–5 (D.N.J. Feb. 16, 2013) ("[T]he Fifth Circuit made clear that a BHCA plaintiff must nevertheless show an anti-competitive tying arrangement exists.  A bank's imposition of a mere condition is not enough; it must be an anti-competitive condition." (internal citation omitted; alteration added)).  "The BHCA was . . . an extension to the field of commercial banking of the general principles of the Sherman Antitrust Act prohibiting anti-competitive tying arrangements."  *Integon Life Ins. Corp. v. Browning*, 989 F.2d 1143, 1149–50 (11th Cir. 1993) (citations omitted).  Yet, nothing in the BHCA's anti-tying provisions prevents a bank from protecting its investments by engaging in traditional banking practices.  *Nordic Bank PLC v. Trend Group, Ltd.*, 619 F. Supp. 542, 556 (S.D.N.Y. 1985) (citations omitted).

Counter-Plaintiffs have alleged the Bank explicitly conditioned an extension of credit to GREC IX on the execution of personal guaranties by the Husband and Wife Guarantors, despite the loan-to-value ratio of the loan and the independent creditworthiness of GREC IX.  (*See* First Resp. 28; Am. Counterclaim ¶¶ 74–75).   Counter-Plaintiffs additionally allege these requirements are "unusual in the banking industry and constitute[] an anti-competitive 'tying' arrangement."  (Am. Counterclaim ¶ 73).  Counter-Plaintiffs plead the Bank has benefitted from this arrangement by creating liability on the part of the Husband and Wife Guarantors for the full amount owed on the loan.  (*See id.* ¶ 76).

Counter-Plaintiffs have not satisfied their obligation to plead sufficient facts for the Court to infer the alleged tying agreement was anti-competitive.   Admittedly, the Amended Counterclaim alleges the Bank's requirement of personal guaranties as a pre-condition to

receiving the loan "constituted an anti-competitive 'tying' arrangement within the meaning of [the BHCA]." (Am. Counterclaim ¶ 73). But such conclusory recitations of "the correct buzz words" are not enough to state a cause of action. *Marchelle Corp.*, 1993 WL 39661, at *5 ("[Plaintiff]'s recitation of the phrase 'anti-competitive tying agreement' would be insufficient to escape disposition under Rule 12(b)(6).").   Counter-Plaintiffs fail to state a cause of action pursuant to 12 U.S.C. section 1972, and Count VII is dismissed.

### F.  Defendants' Affirmative Defenses

The first and second defenses state, respectively, Defendants are entitled to a se-off of any damages for payments made, and damages must be limited to the terms of the loan documents. According to the Bank, the "first and second affirmative defenses are not defenses at all." (Mot. 36). The Bank states the first two affirmative defenses are an attempt by Defendants to shield themselves from damages that are not sought in the Complaint. (*See id.* ("[The Complaint] does not seek to recover amounts already paid, or money that is not owed under the [l]oan [d]ocuments.")). Defendants offer no response to these arguments.

The Complaint seeks damages based on the Promissory Note and personal guaranties, including the outstanding principal, interest, additional default fees and late payment fees, and reasonable attorney's fees and costs, as provided for in the Promissory Note and personal guaranties. (*See generally* Compl.). The Bank does not seek damages "for any and all payments made to and received" from Defendants or damages apart from those concerning "the terms and conditions of the alleged loan documents sued upon." As such, Defendants' first and second affirmative defenses endeavor to avoid a measure of damages the Bank does not request, rendering those defenses immaterial and irrelevant to the Bank's claims. The first and second affirmative defenses are properly stricken.

The Bank asserts the third through twelfth affirmative defenses "all pertain to the negotiation and administration of the [l]oan [d]ocuments[,]" and have all been waived and/or ratified by the various contractual provisions and ratifications signed by Defendants. (Mot. 36). Defendants take the position the release and waiver provisions in the loan documents are not applicable, as again, they were procured by fraud. (*See* First Resp. 41). Given the Court's conclusion that Defendants have properly pleaded the elements of fraudulent inducement, *see* Part III.A, *supra*, the Court agrees with Defendants; the releases and waivers contained in the loan documents do not render these affirmative defenses insufficient.

As to Defendants' tenth and eleventh affirmative defenses, the Bank argues the FDUTPA expressly exempts banks; therefore the Bank cannot violate whatever public policy informs the statute. (*See* First Reply 27). The FDUTPA provides a civil cause of action for "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." FLA. STAT. § 501.204(1). The FDUTPA, however, does not provide a cause of action against banks or savings and loan associations regulated by either the Office of Financial Regulation of the Financial Services Commission or any federal agency. *See* FLA. STAT. §§ 501.212(4)(b)–(c). Furthermore, Defendants agree an affirmative claim against the Bank for a violation of the FDUTPA is precluded by statute. (*See* First Resp. 42).

Defendants attempt to navigate around this statutory bar by arguing, "[the] FDUTPA expresses the will of the legislature that [] unfair and deceptive practices violate public policy, [and] as a result a contract that violates [the] FDUTPA should not be enforced by the courts." (*Id.* 43). Yet, the Florida legislature specifically excluded banks from liability under the FDUTPA. As such, whatever public policy informs the FDUTPA cannot operate to "avoid

liability, wholly or partly, by new allegations of excuse, justification or other negating matters."
*Bluewater Trading LLC v. Willmar USA, Inc.*, No. 07-61284-CIV, 2008 WL 4179861, at *1
(S.D. Fla. Sept. 9, 2008) (citation omitted).  Defendants' tenth and eleventh affirmative defenses
are stricken.

### G.  Defendants' Demand for Trial by Jury

The Bank contends Defendants knowingly and voluntarily waived any rights to a jury
trial when they executed the Promissory Note and various loan renewals.  (*See* Mot. 38).
Defendants argue the Bank has not sufficiently demonstrated the jury trial waivers were made
knowingly, voluntarily, and intelligently.  (*See* Second Resp. 7–10).  At this stage of the
litigation, and on a motion to strike, the Court is not persuaded it is abundantly clear the jury trial
waivers are enforceable.  *See, e.g.*, *Merrill Lynch Bus. Fin. Servs.*, 2005 WL 975773, at *3
(deferring ruling on motion to strike defendants' demand for jury trial because a factual record
needed to be developed and an evidentiary hearing held).

### IV.  CONCLUSION

Based on the foregoing, it is

**ORDERED AND ADJUDGED** as follows:

1.  The Bank's Motion to Dismiss **[ECF No. 93]** is **GRANTED in part** and
    **DENIED in part**.  Defendants have until **February 5, 2014** to file their amended
    answer and counterclaims to the Complaint, and to add any parties.  To this
    extent, the Motion to Extend the Deadline for Filing Motions to Join Parties **[ECF
    No. 137]** is **GRANTED in part and DENIED in part**.

2.  The Bank's Motion to Strike Affirmative Defenses is **GRANTED in part**.

3.  The Bank's Motion to Strike Demand for Jury Trial is **DENIED** without

Case No. 13-21718-CIV-ALTONAGA/Simonton

prejudice.

**DONE AND ORDERED** in Miami, Florida, this 23rd day of January, 2014.

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record