UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-21718-CIV-ALTONAGA/O'Sullivan

**BANK OF AMERICA, N.A.**,

    Plaintiff/Counter-Defendant,
vs.

**GREC HOMES IX, LLC**, *et al.*,

    Defendants/Counter-Plaintiffs.
_____/

## ORDER

**THIS CAUSE** came before the Court on Plaintiff/Counter-Defendant, Bank of America, N.A.'s (the "Bank['s]") Motion to Dismiss Second Amended Counterclaim and Strike Affirmative Defenses . . . ("Motion") [ECF No. 156], filed March 11, 2014. Defendants/Counter-Plaintiffs, GREC Homes IX, LLC ("GREC IX"); GREC Homes X, LLC ("GREC X"); GREC Homes XI, LLC ("GREC XI"); GREC Homes XII, LLC ("GREC XII"); Augustin Herran ("Herran"); Rosiel Herran ("Herran's Wife"); Armando Guerra ("Guerra"); Maria C. Guerra ("Guerra's Wife"); Manuel Herran ("Herran's Father"); Nyria Herran; Emiliano Herran ("Herran's Cousin"); and Miriam Herran (collectively, "Defendants" or "Counter-Plaintiffs"), filed their Response in Opposition to Plaintiff's Motion to Dismiss . . . ("Response") [ECF No. 191] on April 22, 2014. On May 15, 2014, the Bank filed its Reply Memorandum . . . ("Reply") [ECF No. 219]. A hearing on the Motion took place on May 20, 2014 ("May 20 Hearing") [ECF No. 224]. This Order assumes the reader is familiar with the case and the Court's earlier orders, and consequently contains an abbreviated discussion of the issues and applicable law.

# I. BACKGROUND

## A. Procedural Background

On September 3, 2013, Defendants filed an Amended Answer, Affirmative Defenses, and Counterclaim ("Amended Counterclaim") [ECF No. 68].  The Amended Counterclaim contained eleven causes of action and twelve affirmative defenses.  (*See generally* Am. Counterclaim).  On September 30, 2013, the Bank filed a Motion to Dismiss Defendants' Amended Counterclaim . . . . ("First Motion to Dismiss") [ECF No. 93].  By Order dated January 23, 2014 ("January 23 Order") [ECF No. 140], the Court granted in part the First Motion to Dismiss and struck several of the affirmative defenses.  (*See generally* Jan. 23 Order).  Defendants submitted a Corrected Second Amended Answer, Affirmative Defenses, and Counterclaim ("SAC") [ECF No. 150] on February 14, 2014.

## B. Factual Summary

This matter arises out of a loan transaction for a real estate development project between the Bank and Defendants GREC IX, GREC X, GREC XI, and GREC XII (collectively, the "Borrowers" or "GREC Entities").  (*See* Complaint ¶ 7 [ECF No. 1]).  In the early to mid-2000s, when Herran decided to venture into real estate development, the Bank sought his business, and over time Herran "built a relationship of trust and confidence with the Bank that extended far beyond that of [a] creditor [and] debtor . . . ."  (SAC ¶¶ 8–9).[1]

In 2005, Herran embarked on a real estate project to develop eighty-two acres of land into a 1,186-unit residential property initially known as "Keys Edge," later identified as "Grand Palms."  (*Id.* ¶ 11).  GREC IX was formed for the sole purpose of purchasing the land and developing the Keys Edge property, with Herran serving as principal.  (*See id.* ¶ 12).  It was

---

[1] Citations to the SAC refer to the numbered paragraphs corresponding to the counterclaims.

estimated a loan of over $80,000,000 would be required to complete the project. (*See id.* ¶ 14). Teresa Bello ("Bello") and John Nichols ("Nichols"), "Bank executives whose duties included fomenting a relationship of trust with [] Herran" (*id.* ¶ 10), assured Herran he was an "elite" and "preferred" customer, and the Bank would "always find the way to work things out with respect to any loan" (*id.* ¶ 13). As a result of "the relationship of trust and confidence that was established between [] Herran and the Bank and its executives, including [] Bello and [] Nichols, [] Herran chose to give GREC IX's business to the Bank." (*Id.* ¶ 14).

In October 2005, Bello and Nichols suggested Herran form several shell entities — GREC X, GREC XI, and GREC XII (collectively, the "Phantom GREC Entities") — and include them in a Promissory Note [ECF No. 1-2] for the loan in order to circumvent certain transactional state and local taxes and fees on any future real estate projects developed under those entities. (*See id.* ¶¶ 15, 17). Relying on the representations of Bank executives, Herran formed the Phantom GREC Entities and listed them as borrowers on the Promissory Note along with GREC IX, even though the Phantom GREC Entities were not involved in the land purchases. (*See id.* ¶ 17).

In November 2005, the Bank, through Bello and Nichols, insisted Herran, Guerra, Herran's Father, and Herran's Cousin (the "Husband Guarantors") each personally guarantee the Promissory Note for the loan. (*See id.* ¶ 19). The Bank also required the personal guaranties of the wives of the Husband Guarantors — Herran's Wife, Guerra's Wife, Nyria Herran, and Miriam Herran (collectively, the "Wife Guarantors"). (*See id.* ¶ 21). Of all the individual guarantors, only Herran and Herran's Cousin (the "Investor Guarantors") were investors in GREC IX.[2] (*See id.* ¶ 20).

---

[2] At the May 20 Hearing, counsel for Defendants clarified that contrary to the allegations in paragraph 20 of the SAC, Herran's Cousin is an investor in GREC IX.

Based on these representations and Herran's trust in the Bank, on November 14, 2005, the GREC Entities executed a Promissory Note and Master Loan Agreement [ECF No. 1-1] for $84,250,000 from the Bank to fund the acquisition of the land for Keys Edge. (*See id.* ¶ 24). At the same time, each of the Husband and Wife Guarantors executed personal Guaranty Agreements [ECF No. 1-2] on the loan. (*See id.*). The loan and personal guaranties were renewed several times, with the most recent renewal occurring in May 2012. (*See id.* ¶ 31).

After the loan was executed, Bank executives approached GREC IX executives about purchasing an interest rate swap to protect the business interest from the possibility of rising interest rates. (*See id.* ¶ 26). The Bank, through its executives, represented interest rates were going to rise. (*See id.*). At the time these representations were made, the Bank knew them to be false, but it used the interest rate swap agreement[3] as a means of garnering more fees from the Borrowers. (*See id.*). Relying on the representations, Herran, on behalf of GREC IX, agreed to the Rate Swap. (*See id.* ¶ 27). Shortly thereafter, interest rates fell, costing the Borrowers nearly two million dollars in charges associated with falling interest rates. (*See id.* ¶ 28).

The SAC contains nine causes of action: fraudulent inducement of GREC IX to enter the Rate Swap (Count I); fraudulent inducement of the Wife Guarantors to execute personal guaranties on the Promissory Note (Count II); fraudulent inducement of the Husband Guarantors to execute personal guaranties on the Promissory Note (Count III); fraudulent inducement of Herran to execute a personal guaranty on the Promissory Note (Count IV); breach of fiduciary duty owed to GREC IX related to the Rate Swap and acquisition/subordination of Franklin Bank's interest in the loan (Count V); breach of fiduciary duty owed to the Phantom GREC

---

[3] The interest rate swap agreement is comprised of an ISDA 2002 Master Agreement [ECF No. 93-1], Schedule to the 2002 Master Agreement [ECF No. 93-2], March 9, 2006 Confirmation [ECF No. 93-3], and April 6, 2007 Confirmation [ECF No. 93-4] (collectively, the "Rate Swap").

Entities related to the Promissory Note (Count VI); fraudulent inducement of the Phantom GREC Entities to execute the Promissory Note (Count VII); violation of the Wife Guarantors' rights under the Equal Credit Opportunity Act, 15 U.S.C. sections 1601–1691f (the "ECOA") (Count VIII); and violation of the Bank Holding Company Act, 12 U.S.C. sections 1971–1978 (the "BHCA"), against the Phantom GREC Entities (Count IX). (*See generally* SAC).

The SAC contains the following affirmative defenses: (1) the Bank's claims are barred by the doctrine of unclean hands; (2) the Bank contributed to its own alleged damages by refusing to properly fund the loan; (3) any award to the Bank is subject to offset for damages suffered as a result of the Bank's misconduct; (4) the claims against the Wife Guarantors violate the ECOA; (5) the claims against the individual guarantors are unenforceable, as the guaranties were the result of fraud in the inducement; (6) the claims against the Phantom GREC Entities are barred, as the Note and its renewals were procured through fraud; (7) all claims against the Defendants are unenforceable, as the Bank violated the BHCA by requiring the Phantom GREC Entities' participation in the loan; and (8) all claims against Defendants are void, as the Bank's requirement of having the Phantom GREC Entities added to the Promissory Note is an illegal attempt to avoid the Florida documentary stamp tax in contravention of public policy. (*See generally* SAC).

The Motion seeks dismissal of the counterclaims and the striking of the affirmative defenses. (*See generally* Mot.).

## II. ANALYSIS

The Bank continues to argue waivers and releases contained in the loan documents foreclose Counter-Plaintiffs' claims against the Bank. (*See* Mot. 3). According to the Bank, the effect of the waivers and releases compels dismissal of all of the counterclaims and defenses.

5

(*See id.*).  More specifically, the Bank argues Counts I, II, III, IV and VII fail to state claims for rescission.  (*See id.* 3–15).  The Bank maintains dismissal of Count V is warranted because the Bank did not owe GREC IX any fiduciary duties pursuant to the terms of the Rate Swap and loan documents, and new allegations concerning the Bank's conduct in connection with the Franklin Bank loan interest are conclusory.  (*See id.* 15–17).  Regarding Count IX, the Bank contends advising Counter-Plaintiffs to form the Phantom GREC Entities and requiring the latters' inclusion on the Promissory Note does not amount to an anti-competitive tying arrangement sufficient to state a cause of action for violating the BHCA.  (*See id.* 17–19).

Counter-Plaintiffs assert — as they did in their earlier briefing — the waivers and releases in the loan documents are not binding, as releases and merger and integration clauses contained in fraudulently induced contracts are unenforceable.  (*See* Resp. 33–34).  Counter-Plaintiffs argue they have cured the previous pleading defects in their fraudulent inducement claims (Counts I, II, III, IV, and VII), entitling them to seek rescission of the various loan documents.  (*See id.* 8–9).  Counter-Plaintiffs maintain they have adequately pleaded a claim for breach of fiduciary duty in Count V.  (*See id.* 24–27).  Counter-Plaintiffs reason they have adequately pleaded a claim pursuant to the BHCA in Count IX, as the Bank's requirement of having the Phantom GREC Entities included as borrowers on the Promissory Note is an anti-competitive tying arrangement designed to benefit the Bank.  (*See id.* 31–33).  Finally, Counter-Plaintiffs note the Bank does not challenge the substance of Counts VI and VIII, and the affirmative defenses, and these must be allowed to proceed on the basis of the properly pleaded allegations of fraudulent inducement.  (*See id.* 33–37).

### A. Enforceability of the Releases, Waivers, and Merger & Integration Clauses

As it did in the First Motion to Dismiss, the Bank asserts all of the counterclaims and

affirmative defenses are improper because they have been waived and released through the various loan documents. (*See* Mot. 3). But as previously explained, it "is the well-settled rule 'that a party can not contract against liability for his own fraud[,]' absent specific contractual language to the contrary." (Jan. 23 Order 10 (alteration in original; citations omitted)). Where, as here, "a party alleges that a contract was procured by fraud or misrepresentations as to a material fact, an integration clause will not make the contract incontestable, and the oral representation may be introduced into evidence to establish fraud." *MeterLogic, Inc. v. Copier Solutions, Inc.*, 126 F. Supp. 2d 1346, 1363 (S.D. Fla. 2000) (citations omitted). As before, Counter-Plaintiffs adequately plead sufficient facts to support their claims they were fraudulently induced into signing the various loan documents and personal guaranties. The releases and disclaimers contained in the loan documents did not compel a dismissal of the counterclaims or the striking of affirmative defenses before, nor do they persuade a different result is warranted now.

### B.  Counts I, II, III, IV, & VII — Fraudulent Inducement Claims

The Bank reasserts Counter-Plaintiffs' claims for fraudulent inducement fail because Counter-Plaintiffs are unable to state claims for the relief Counts I, II, III, IV, and VII seek — rescission of the loan documents and Rate Swap. (*See* Mot. 3–15). The Bank argues rescission is unavailable as a remedy because the benefits Counter-Plaintiffs received have not been returned to the Bank and Counter-Plaintiffs fail to allege the inadequacy of a remedy at law. (*See id.*).

"Florida law provides for an election of remedies in fraudulent inducement cases: rescission, whereby the party repudiates the transaction, or damages, whereby the party ratifies the contract." *Mazzoni Farms, Inc. v. E.I. DuPont De Nemours and Co.*, 761 So. 2d 306, 313

(Fla. 2000) (citation omitted). Although rescission is a "drastic and extraordinary measure . . . [rescission] is appropriate in situations where one party has fraudulently induced another party to contract . . . ." *Ohio Players, Inc. v. Polygram Records, Inc.*, No. 99Civ.0033, 2000 WL 1616999, at *3 (S.D.N.Y. Oct. 27, 2000) (alteration added; citation and internal quotation marks omitted). "[A] party seeking rescission must show, *inter alia*, that he has rescinded the contract and notified the other party of such rescission, has offered to return any benefits from the contract[,] and has no adequate remedy at law." *Gov't of Aruba v. Sanchez*, 216 F. Supp. 2d 1320, 1365 (S.D. Fla. 2002) (alterations added) (citing *Billian v. Mobil Corp.*, 710 So. 2d 984, 990–91 (Fla. 4th DCA 1998)). But where no tangible benefit has been provided, alleging the return of benefits is unnecessary. *See Crown Ice Mach. Leasing Co. v. Sam Senter Farms, Inc.*, 174 So. 2d 614, 618 (Fla. 2d DCA 1965); *see also Staaldam Beheer B.V. v. ASAP Installations, LLC*, No. 809-CV-02226-T-17EAJ, 2010 WL 1730780, at *4–5 (M.D. Fla. Apr. 28, 2010).

The Court now turns to the specific arguments regarding the various counts that seek rescission.

### 1. Count I

The Bank, relying in large part on the Court's prior statements on this issue, asserts GREC IX cannot rescind the Rate Swap because GREC IX is incapable of returning the benefits it received, and the allegation regarding the return of a single monthly payment made to GREC IX on the Rate Swap is insufficient to rescind the agreement. (*See* Mot. 14–15). According to Counter-Plaintiffs, courts have refused to apply the tender back rule where benefits received under a contract were, at best, intangible. (*See* Resp. 9–13 (citing cases)). Further, Counter-Plaintiffs contend in similar cases involving fraudulently induced insurance contracts, Florida courts have found rescission is a viable remedy. (*See id.* 13–16).

The January 23 Order concluded the equitable remedy of rescission was unavailable to GREC IX, "[a]s GREC IX is incapable of returning the benefits it received from the Rate Swap[.]" (Jan. 23 Order 17 (citation omitted)). Counter-Plaintiffs note in their present briefing, "[w]here restoration of the status quo is impossible . . . a court may still grant rescission, provided the equities between the parties can be balanced." *Braman Dodge, Inc. v. Smith*, 515 So. 2d 1053, 1054 (Fla. 3d DCA 1987) (alterations added; citations omitted); *see also Kobatake v. E.I. DuPont de Nemours and Co.*, 162 F.3d 619, 626–27 (11th Cir. 1998) (applying Georgia law); *Methodist Hosps., Inc. v. FTI Cambio, LLC*, No. 2:11-CV-036, 2011 WL 2610476, at *5 (N.D. Ind. July 1, 2011) ("Equity will in an appropriate case order rescission without restoration if . . . (7) restoration is impossible for some reason not hereinbefore mentioned and the clearest and strongest equity demands that rescission be granted (sometimes with a monetary substitute for restoration).") (citation omitted). It is unclear whether the equities between the parties will be capable of being "balanced," but the Court declines the invitation to dismiss on the basis of difficulty in balancing the equities at the pleading stage, given a "flexible and pragmatic approach" is preferred. *Kobatake*, 162 F.3d at 626 (citation omitted).

Regarding the unavailability of an adequate remedy at law, Counter-Plaintiffs somewhat better plead this element now than they did in their earlier pleading. (*See* SAC ¶ 40). They explain because of "the nature of a [Rate Swap] (akin to an insurance contract)," there is no adequate remedy at law. (*Id.*). While the allegation is admittedly weak, because the Court is deciding this issue without the benefit of a factual record, in light of the additional efforts to plead this element it appears the better course is to resolve this question at summary judgment or trial. *See Belaire at Boca, LLC v. Ass'ns Ins. Agency, Inc.*, No. 06-80887-CIV, 2007 WL 1812218, at *4 (S.D. Fla. June 22, 2007) (refusing to dismiss claim for rescission on ground an

9

inadequate remedy at law was not pleaded) (citation omitted)); *Rubesa v. Bull Run Jumpers, LLC*, No. 09-CV-81107, 2010 WL 376320, at *3 (S.D. Fla. Jan. 26, 2010) (refusing to dismiss claim for rescission despite inclusion of claim for legal remedy in complaint "[b]ecause the facts are not yet developed in this case") (alteration added)).

### 2. Counts II, III, & IV

In Counts II, III, & IV, the individual guarantors allege they were fraudulently induced into signing unwarranted personal guaranties for the loan when, in fact, the loan could have been made based on the loan-to-value ratio. (*See* SAC ¶¶ 41–67). The Court previously dismissed the Husband and Wife Guarantors' rescission claims because the guarantors failed to adequately plead they returned the benefits received or allege they received no benefits. (*See* Jan. 23 Order 17–18).

Despite the Bank's assertions to the contrary, the earlier pleading deficiencies have been cured. Counter-Plaintiffs now allege none of the individual guarantors (except for Herran and Herran's Cousin — the Investor Guarantors) "were principals or individual investors in any of the GREC Entities, including GREC IX." (SAC ¶¶ 48, 57). These guarantors received no benefits, tangible or otherwise (*see id.*), as the proceeds from the loan went directly to GREC IX and the purchase of real estate in GREC IX's name (*see id.* ¶ 25).

As to the Investor Guarantors, alleging return of a benefit is not required to state a claim for rescission if restoration to the status quo is impossible. *See Braman Dodge, Inc.*, 515 So. 2d at 1054. Instead, and again, in these situations a court looks to see if it can balance the equities between the parties. *See id.; see also Methodist Hosps.*, 2011 WL 2610476, at *5. Given the allegations of fraudulent inducement to procure the personal guaranties and the decline in the land's value, it does not appear possible to return the parties to the status quo. Therefore, any

failure of the Investor Guarantors to return whatever benefits they received as investors or as principals in the GREC Entities is not a ground to dismiss the claim for rescission.[4]

### 3. Count VII

The Court previously determined the Phantom GREC Entities had arguably "pleaded enough facts to support their assertion that [they] never received a benefit pursuant to the loan." (Jan. 23 Order 19). The Phantom GREC Entities' claim for rescission was nevertheless dismissed because the absence of an adequate remedy at law was not pleaded. (*See id.* 20).

The Bank again argues the Phantom GREC Entities have not properly pleaded a claim for rescission, specifically pointing to the requirement of pleading the inadequacy of a remedy at law. (*See* Mot. 10–12). In this regard the SAC now alleges the "Phantom GREC Entities received absolutely no benefit . . . from being included on the note . . . [and] have no interest in either the land or in GREC IX." (SAC ¶ 93) (alterations added). The only reason the Phantom GREC Entities are included on the Promissory Note is allegedly because of the fraudulent conduct of the Bank. (*See id.* ¶ 87). On the basis "damages cannot provide an adequate remedy for the Phantom GREC Entities' obligation to repay the Note" (Resp. 23), the Counter-Plaintiffs allege they "have no adequate remedy at law" (SAC ¶ 94).

Again, "a court is rarely able to determine the adequacy of a remedy at law at the pleading stage of a case before the facts are developed." *Billian*, 710 So. 2d at 991; *see also Belaire at Boca, LLC*, 2007 WL 1812218, at *4; *Rubesa*, 2010 WL 376320, at *3. And while Count VI seeks damages for the Bank's alleged breach of fiduciary duty to the Phantom GREC Entities and may ultimately furnish an adequate legal remedy, the Court will not make this

---

[4] Certainly the court in *FDIC v. Kuang Hsung Chuang*, 690 F. Supp. 192, 196–97 (S.D.N.Y. 1988), refused to rescind a guaranty, noting a company president had received the benefit of the bargain from a loan to his company. (*See* Jan. 23 Order 18 n.10). But the case does not address the possibility of awarding rescission if restoring the parties to the status quo is impossible and the equities are capable of being balanced, arguments the Court is asked to consider in the present briefing.

determination on the pleadings alone. *Cf. Anchor Bank, S.S.B. v. Conrardy*, 763 So. 2d 360, 361 (Fla. 4th DCA 1998) ("[T]hat there is a related cause of action at law does not, alone, preclude maintaining a rescission claim." (alteration added; citation omitted)). Consequently, dismissal of Count VII on the ground an inadequate remedy at law is not sufficiently pleaded is denied.

### C. Count V — Breach of Fiduciary Duty

The Bank next argues the breach of fiduciary duty claim in Count V fails given the Bank did not owe GREC IX the duties of a fiduciary pursuant to an express disclaimer contained in the Rate Swap. (*See* Mot. 15–17). As to Counter-Plaintiffs' new allegations concerning the acquisition and subordination of a Franklin Bank participation interest in the loan (*see* SAC ¶¶ 71, 73, 76), the Bank contends these do not support the claim for breach of fiduciary duty either (*see* Mot. 16).

The Court previously determined the Phantom GREC Entities and the Bank were engaged in a relationship of trust and confidence sufficient to establish a fiduciary relationship. (*See* Jan. 23 Order 23 (citing Am. Counterclaim ¶¶ 10, 13)). In the SAC, Counter-Plaintiffs again allege facts demonstrating a relationship of trust and confidence between the Bank and the Phantom GREC Entities based on the relationship between the Bank and Herran. (*See* SAC ¶¶ 10, 13). Because Herran is the principal of GREC IX (*see* SAC ¶ 12), the same factual allegations support the existence of a fiduciary relationship between GREC IX and the Bank.

The January 23 Order noted the disclaimer contained in the Rate Swap expressly and unambiguously denies the existence of a fiduciary relationship between the Bank and GREC IX for the purposes of that transaction. (*See id.* 22). Of course, GREC IX's claim for breach of a fiduciary relationship is dependent on GREC IX voiding the relevant provisions of the Rate Swap through rescission.

### D. Count IX — Violation of the BHCA

The Amended Counterclaim alleged the Bank violated the BHCA by illegally tying the loan agreement to the condition the Husband and Wife Guarantors personally guarantee the loan. The SAC now alleges the Bank violated the BHCA by requiring the Phantom GREC Entities be named as borrowers on the Promissory Note. (*See* SAC ¶ 106). The Bank argues this behavior is neither a tying arrangement nor anti-competitive in nature. (*See* Mot. 18).

Counter-Plaintiffs allege the Bank explicitly conditioned an extension of credit to GREC IX on the formation of the Phantom GREC Entities and their inclusion on the Promissory Note. (*See* SAC ¶¶ 104–106). Counter-Plaintiffs also allege these requirements are an "unusual banking practice" and constitute an anticompetitive tying arrangement. (*Id.* ¶ 104; *see also id.* ¶ 105). Counter-Plaintiffs explain the Bank "required that the Phantom GREC Entities be so included as borrowers so that it could lock in and monopolize future banking and lending activities of the Phantom GREC Entities." (*Id.* ¶ 105).

Unlike the earlier BHCA claim, Counter-Plaintiffs now plead sufficient facts for the Court to infer the alleged tying agreement was anticompetitive. The very nature of the creation of the Phantom GREC Entities is alleged to have locked Herran and the Phantom GREC Entities into future real estate developments deals. According to Counter-Plaintiffs, the granting of the loan in the first instance was conditioned upon the Phantom GREC Entities being formed and included as borrowers on the Promissory Note — an act alleged to be unusual and anticompetitive. Consequently, Count IX states a claim pursuant to 12 U.S.C. section 1972.

### E. Counts VI and VIII, and Defendants' Affirmative Defenses

In conclusory fashion, the Bank argues the "releases and waivers [contained in the various loan documents] operate to bar every conceivable claim and affirmative defense the

13

Defendants might assert against the Bank." (Mot. 3). Counter-Plaintiffs note the January 23 Order determined the substance of Counts VI and VIII, and the remaining affirmative defenses were properly pleaded. (*See* Resp. 33–34). At the May 20 Hearing, Counter-Plaintiffs also noted it would be improper for the Court to strike all of the affirmative defenses absent more particularized briefing and a thorough analysis of each affirmative defense.

The Court agrees. Neither the Bank's Motion nor its Reply contains any argument specific to any of the eight affirmative defenses or the claims in Counts VI and VIII. The Court previously found Counter-Plaintiffs stated a claim of breach of fiduciary duty as to the Promissory Note (*see* Jan. 23 Order 22–24), and a violation of the ECOA (*see id.* 24–27), claims substantially similar to those contained in Counts VI and VIII. Similarly, the affirmative defenses listed in the SAC are either duplicates or nearly similar versions of the affirmative defenses the Court previously declined to strike. (*See id.* 29–31; *compare* SAC 6–11 *with* Am. Counterclaim 6–12). Consequently, "[a]s Counter-Plaintiffs have properly pleaded the elements of fraudulent inducement, the releases and disclaimers contained in the loan documents do not compel a dismissal of the counterclaims or the striking of affirmative defenses." (Jan. 23 Order 14 (alteration added); *see also* Part II.A, *supra*).

### III. CONCLUSION

Based on the foregoing, it is

**ORDERED AND ADJUDGED** that the Bank's Motion **[ECF No. 156]** is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 19th day of June, 2014.

_____
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record